**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Ohio Legal Rights Service,

       Plaintiff,

   vs.                           Case No. 2:04-cv-384
                                         JUDGE GRAHAM

The Buckeye Ranch, Inc.,
et al.,

       Defendants.


<u>OPINION AND ORDER</u>


    Plaintiff Ohio Legal Rights Service ("OLRS") brings this action under the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. §§10801-10851, and under Ohio law, Ohio Rev. Code §5123.60(E) to obtain access to records from Defendant the Buckeye Ranch, Inc. Defendant operates a residential treatment facility for children with mental illness. OLRS seeks access to two categories of records: (1) records relating to a 13-year-old child who suffered a wrist injury in February 2004 while residing at the Buckeye Ranch, and (2) logs maintained by the Buckeye Ranch regarding its staff's use of seclusion and restraint techniques on children. OLRS requests relief in the form of a declaratory judgment and permanent injunction. Also named as defendants are the Buckeye Ranch's President, Richard E. Reiser, and Quality Improvement Director, Michelle Delery Stratman.

    This matter is before the Court on two related motions: the Buckeye Ranch's motion to dismiss the complaint for failure to

state a claim, and OLRS's motion for summary judgment.  OLRS has requested that the Buckeye Ranch's motion to dismiss be treated as a motion for summary judgment.  The Court agrees.  Attached to the motion to dismiss are two letters not referenced in the complaint.  See Mot. to Dismiss, Exs. A, B.  Further, the motion to dismiss refers to events that occurred after this action was filed.  Id., p. 10.  In briefing OLRS's motion for summary judgment, both parties have had a reasonable opportunity to present their arguments and supporting materials.  Thus, the Buckeye Ranch's motion to dismiss will be treated as a motion for summary judgment.  See Fed. R. Civ. P. 12(b).

**I.  Background**

   **A.  The Parties**

OLRS was created under Ohio law to "protect and advocate the rights of mentally ill persons."  O.R.C. §5123.60(A).  The Governor of Ohio has designated OLRS as a protection and advocacy agency for persons with mental illness, meaning that OLRS may exercise the powers given under PAMII to such state agencies.  Pl.'s Mot. for Summ. J., Ex A. (Executive Order 98-35V); 42 U.S.C. §10805.  OLRS has the authority to pursue legal, administrative and other remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in Ohio.  See 42 U.S.C. §10805; O.R.C. §5123.60.

The Buckeye Ranch is a not-for-profit corporation located in Franklin County, Ohio.  Pl.'s Mot. for Summ. J., Ex. D.  The Buckeye Ranch is licensed by the Ohio Department of Mental Health as a mental health organization, and it operates a residential treatment facility in which it provides care and community services

2

for children with mental illness.    Defs.' Mot. to Dismiss, p. 2.
 The Buckeye Ranch also has a crisis center in which "many" of the
youth admitted are "not mentally ill or developmentally delayed."
July 22, 2004 Decl. of Richard E. Reiser, ¶11.  According to Mr.
Reiser, "approximately twenty percent of the youth receiving
residential or partial hospitalization treatment services from the
Buckeye Ranch . . . are in the custody of their parents," while
eighty percent are in the custody of a governmental agency.  Id.,
¶17.

### B.  Wrist Records

     In February 2004, OLRS received an incident report regarding
an injury to a 13-year-old child residing at the Buckeye Ranch.
See May 27, 2004 Decl. of Patrick Washburn, ¶11.  The report stated
that the child had been diagnosed with a buckle fracture of an
unknown cause.  Id., ¶12.  Mr. Washburn, an investigator for OLRS,
interviewed staff at the Buckeye Ranch about the incident.  Id.,
¶13.  He found that the child had complained of pain in her wrist
in early February 2004 and was seen by a medical doctor, who
diagnosed her with a strain.  Id., ¶14.  On February 10, 2004,
restraints were used on the child three times in one day.  Id.  The
child again complained of wrist pain, and an x-ray was taken on
February 13.  Id.  The x-ray revealed a buckle fracture.  Id.  Mr.
Washburn concluded that, based on the incident report and his
interviews with staff, there was probable cause to believe that the
child had been abused or neglected and that she might be abused or
neglected in the future.  Id., ¶16.

     Mr. Washburn spoke with Michelle Delery Stratman on March 26,
2004 and requested access to the child's records.  Id., ¶17.  On

3

March 30, Ms. Stratman phoned Mr. Washburn and told him that he could not review the records without the consent of the child's legal guardian.  Id., ¶18.  Ms. Stratman informed Mr. Washburn that the child's legal guardian was Franklin County Children Services. Id., ¶19.

On June 15, 2004, after this action was filed, the Buckeye Ranch informed OLRS that it had contacted Franklin County Children Services and obtained permission to disclose the child's records to OLRS.  Pl.'s Mot. for Summ. J., Ex. I.  According to Mr. Washburn, certain records relating to the child were indeed disclosed to OLRS, but other documents were not, such as daily progress reports, counseling notes, and documentation of contra-indications for the use of seclusion and restraint.[1]  July 1, 2004 Decl. of Patrick Washburn, ¶8.

**C.  Seclusion and Restraint Logs**

The Buckeye Ranch maintains documentation of its staff's use of physical restraint and seclusion techniques on its residents. Reiser Decl., ¶9; see Ohio Admin. Code §5122-26-16(D)(10) (requiring agencies that care for mentally-ill individuals to maintain such logs).

Based on incident reports received by OLRS and investigations it conducted, OLRS became concerned about "the number of incidents of alleged abuse and neglect occurring during seclusion and restraint as well as the nature of injuries during such episodes." June 2004 Decl. of Carolyn S. Knight, ¶¶7-10.  OLRS staff met with

---

[1]  The Buckeye Ranch initially argued that the complaint should be dismissed as moot because OLRS had received the records it wanted.  The Buckeye Ranch withdrew that argument after OLRS stated that it had not received all of the records it wanted.

Mr. Reiser in July 2003 to discuss its concerns. Id., ¶14.

On December 16, 2003, OLRS sent a letter to the Buckeye Ranch requesting monthly copies of the Buckeye Ranch's seclusion and restraint logs. Defs.' Mot. to Dismiss, Ex. A. The letter stated that OLRS was making the same request to children's treatment facilities around the state in an effort to develop a statewide database of seclusion and restraint usage. OLRS sent another letter on February 18, 2004 repeating its request to the Buckeye Ranch. Defs.' Mot. to Dismiss, Ex. B.

On March 9, 2004, the Buckeye Ranch responded with a letter stating that it is required to send its logs to the Ohio Department of Mental Health. Defs.' Mot. to Dismiss, Ex. C. The letter suggested that if OLRS wanted the logs, it should obtain them from the Department of Mental Health. "The Buckeye Ranch is not comfortable forwarding Seclusion and Restraint logs to an agency that has not been charged with this responsibility." Id.

In that same month, the Cincinnati Enquirer published a series of newspaper article on widespread abuse and neglect of children in state-funded treatment facilities. Pl.'s Mot. for Summ. J., Ex. F. One of the facilities mentioned was the Buckeye Ranch. OLRS Executive Director Carolyn S. Knight read those articles. Knight Decl., ¶17. This prompted Ms. Knight to write the Buckeye Ranch once again to request copies of its seclusion and restraint logs. Defs.' Mot. to Dismiss, Ex. D. Though the letter mentioned the newspaper articles, Ms. Knight requested the logs for the purpose of developing a database on seclusion and restraint usage. There is no evidence on the record that the Buckeye Ranch responded to this letter.

On April 23, 2004, counsel for OLRS sent a letter to the Buckeye Ranch again requesting access to the seclusion and restraint logs. Defs.' Mot. to Dismiss, Ex. E. OLRS asserted that it had a right under PAMII and state law to review the logs. On May 4, counsel for the Buckeye Ranch responded by asserting that OLRS had no such right. Defs.' Mot. to Dismiss, Ex. F.

Ms. Knight states that she has concluded that probable cause exists to believe that one or more children at the Buckeye Ranch may have been subjected to abuse or neglect during incidents of seclusion and restraint. Knight Decl., ¶26. Ms. Knight reached this conclusion based on the number of incident reports received, OLRS's investigation of the Buckeye Ranch over a 2-year period, the Cincinnati Enquirer articles, and the report of the wrist injury to the 13-year-old child. Id., ¶27.

## II.  **Standards of Review**

### A.  **Summary Judgment**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, LaPointe, 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks

evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993)(quoting Anderson, 477 U.S. at 251-53). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. See also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court

considering a motion for summary judgment may not weigh evidence or make credibility determinations.  <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

###### B.  Declaratory Relief

OLRS seeks declaratory relief under section 2201 of Title 28 of the United States Code.  That section provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §2201.  A district court may issue a declaratory ruling when a judgment: (1) will serve a useful purpose in clarifying and settling the legal relationship in issue, and (2) terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  <u>Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.</u>, 746 F.2d 323, 326 (6th Cir. 1984).

The Court finds that this action is suitable for a declaratory ruling on the issue of whether the Buckeye Ranch must disclose the wrist records and the seclusion and restraint logs.  OLRS has asserted a right under federal and state law to have access to those records and logs.  A declaratory ruling will clarify the parties' rights and obligations and will terminate the parties' uncertainty as to whether the records and logs must be disclosed.

###### C.  Permanent Injunction

OLRS also seeks permanent injunctive relief.  In order to obtain a permanent injunction, plaintiff must demonstrate that failure to issue the injunction is likely to result in irreparable harm and that there is not an adequate remedy at law.  <u>United</u>

States v. Szoka, 260 F.3d 516, 523 (6th Cir. 2001); Kallstrom v. City of Columbus, 136 F.3d 1055, 1068 (6th Cir. 1998).  In addition, the plaintiff must demonstrate actual success on the merits rather than a likelihood of success, as is required when a preliminary injunction is requested.  University of Texas v. Camenisch, 451 U.S. 390, 392, 101 S.Ct. 1830, 1832 (1981); Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 (1987).

There is no dispute that a protection and advocacy agency's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people constitutes irreparable harm.  See State of Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Bd. of Educ., 355 F.Supp.2d 649, 653 (D. Conn. 2005) (citing cases).  Further, there is no dispute that the only adequate relief would be to require the Buckeye Ranch to provide OLRS with access to the relevant records. What the parties disagree over is whether OLRS can demonstrate actual success on the merits of its claim that it is entitled to access under federal and state law.

**III.  Discussion**

    **A.  OLRS's Statutory Authority under PAMII**

Congress enacted the Protection and Advocacy for Mentally Ill Individuals Act to protect the rights of mentally ill individuals. 42 U.S.C. §§10801-10807.  PAMII provides federal funding for states to "establish and operate a protection and advocacy system for individuals with mental illness which will (A) protect and advocate the rights of such individuals through activities to ensure enforcement of the Constitution and Federal and State statutes; and

(B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. §10801(b)(2).  In Ohio, OLRS has been created by statute to serve as a protection and advocacy system and has been designated as such by the governor.  Ohio Rev. Code §5123.60; Executive Order 98-35V.

Protection and advocacy systems are authorized to "investigate incidents of abuse and neglect of individuals with mental illness" and to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the state." 42 U.S.C. §10805(a)(1)(A)-(B).  PAMII provides these systems with the independent authority to pursue legal remedies to ensure the protection of individuals with mental illness. 42 U.S.C. §10805(a)(1)(B).  This authority has led courts to conclude that protection and advocacy systems have standing to bring actions for declaratory or injunctive relief in a judicial forum.  See Protection & Advocacy For Persons With Disabilities v. Armstrong, 266 F.Supp.2d 303, 311-12 (D. Conn. 2003) (citing Kentucky Prot. & Advocacy Div. v. Hall, et al., No. 3:01cv-538-H, slip. op. (W.D. Ky. Sept. 24, 2001)).

PAMII grants protection and advocacy systems access to the records of three classes of individuals with mental illness.  42 U.S.C. §10805(a)(4).  Two of these classes are not at issue in this case.[2]  OLRS seeks access to the records of only the class of

_____

[2] Not at issue in this case are the classes of individuals set forth in subsections (A) and (C) of §10805(a)(4).  Under subsection (A), systems have access to the records of any "individual who is a client of the system if such

individuals described in subsection (B) of §10805(a)(4). Under this subsection, protection and advocacy systems have access to the records of any individual:

> (i) who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;

> (ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

> (iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect.

42 U.S.C. §10805(a)(4)(B).

If the requirements of subsection (B) are satisfied, a protection and advocacy system is given access to "reports prepared by any staff or faculty rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." 42 U.S.C. §10806(b)(3)(A).

Any records obtained under PAMII by a protection and advocacy system are subject to the same federal or state confidentiality regulations that are applicable to providers of mental health

---

individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access." 42 U.S.C. §10805(a)(4)(A). Under subsection (C), systems have access to records of any "individual with a mental illness who has a legal guardian, conservator or other legal representative, and with respect to whom either (1) a complaint has been made to the system, or (2) for whom there is probable cause to believe his health or safety is in serious and immediate jeopardy, if the system contacts the legal guardian, conservator or legal representative, offers assistance to that person, but that person fails or refuses to act on behalf of the person with a mental illness." 42 U.S.C. §10805(a)(4)(C).

services.  42 U.S.C. §10806(a).

**B.  OLRS's Right to the Wrist Records under PAMII**

**1.  The Child's Capacity to Authorize Access**

The first requirement for access under subsection (B) is that the individual is unable, by reason of a mental or physical condition, to authorize the protection and advocacy system to have access to her records.  OLRS argues that minors lack the capacity to make informed health care decisions.  The Buckeye Ranch counters that minors have the mental capacity to make informed decisions in many situations.  The Buckeye Ranch relies on case law concerning a minor's capacity to direct counsel in a legal proceeding.

Minors in Ohio are presumed incompetent to make health care decisions.  See, e.g., In re Guardianship of Crum, 61 Ohio Misc.2d 596, 603, 580 N.E.2d 876, 881 (Ohio Prob. Ct. 1991) (rule in Ohio is "to allow the guardian of a minor to be empowered to make health care decisions regarding the care of the ward"); In re Guardianship of Stein, 105 Ohio St.3d 30, 44, 821 N.E.2d 1008, 1019-20 (2004) (same).  Further, even if the Buckeye Ranch is correct that minors do have the capacity to make informed decisions in some situations, it has not proved that this is one of those situations.  Not only is the child whose records OLRS seeks a minor, she is also mentally ill.  Though Mr. Reiser has stated that the Buckeye Ranch has a crisis center in which "many" of the children do not have a mental illness, there is no allegation that the child here had been placed in the crisis center.  Ms. Stratman states that the child broke her wrist during her "residency" at the Buckeye Ranch.  July 22, 2004 Decl. of Michelle Delery Stratman, ¶5.  Given the Buckeye Ranch's primary function of operating a residential treatment facility for

12

children with mental illness, it is fair to presume that the child was mentally ill. Indeed, several courts have held that "PAMII does not require [a protection and advocacy system to] demonstrate a threshold showing of mental illness on the part of [the individual whose records are sought]." Disability Law Center v. Millcreek Health Center, 339 F.Supp.2d 1280, 1283-84 (D. Utah 2004) (citing Protection & Advocacy For Persons With Disabilities v. Armstrong, 266 F.Supp.2d 303, 314-16 (D. Conn. 2003)). As one court found, "[d]emanding a conclusive, individualized showing of . . . mental illness before permitting access would reserve a gatekeeping function contrary to the specific terms and general purpose of [PAMII]." Michigan Protection & Advocacy Service, Inc. v. Miller, 849 F.Supp. 1202, 1207 (W.D. Mich. 1994).

Ms. Stratman has unhelpfully offered her conclusion that "the youth did not and does not have a physical or mental condition rendering her incapable of authorizing access to the Wrist Records." Stratman Decl., ¶5. See Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) (district court not required to accept as true legal conclusions couched as a factual statement). According to Ms. Stratman, while the child was "a resident at the Ranch, [she] communicated and expressed her wishes in a variety of matters with staff at the Ranch." Stratman Decl., ¶5. The Court does not question the credibility of Ms. Stratman's statement that the child could express her wishes; however, Ms. Stratman provides no further detail about the matters in which the child expressed her wishes, the child's ability to communicate, her level of maturity, her awareness of her own needs, or her ability to make decisions. Without more, the Court is unprepared to find

13

that the child had the capacity to authorize access to her records.

The Court borrows from the reasoning in Millcreek, Armstrong, and Miller in holding that, in order to obtain access to records under 42 U.S.C. §10805(a)(4)(B), a protection and advocacy system need not make a conclusive, individualized showing that a mentally-ill child possesses the capacity to authorize access to her records. Congress charged protection and advocacy systems with the duty to protect and advocate the rights of mentally-ill individuals. Congress endowed these systems with the express authority to investigate incidents of abuse and neglect and to obtain access to records. It would be contrary to the language and purpose of PAMII to deny OLRS access to the records of a mentally-ill child, whom OLRS believes was abused or neglected, simply because OLRS cannot not conclusively demonstrate that the child had the capacity to authorize access to her records. The burden should be on the facility treating or housing the child to show that the child possesses the capacity to authorize a protection and advocacy system to have access to her records.[3]

The Court will afford the Buckeye Ranch an opportunity to make such a showing. The Buckeye Ranch is instructed to file within

---

[3] Courts have similarly not required protection and advocacy systems to make individualized showings that individuals do not have a legal guardian. See Armstrong, 266 F.Supp.2d at 318 (placing "burden to show the presence of a legal guardian, conservator or legal representative on the facility blocking a [system's] access") (citing Cramer v. Chiles, No. 98-43-MISC-T-26A, slip op. (M.D. Fla. Sept. 1, 1998)). If a treating facility objects to a request for records on the grounds that the individual has a legal guardian other than the State, then the facility carries the burden to provide contact information for the individual's guardian. See State of Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Bd. of Educ., 355 F.Supp.2d 649, 661 (D. Conn. 2005) (noting that "the statutes and regulations create a responsibility on the part of an institution to provide contact information for an individual's 'legal guardian, conservator, or other legal representative'").

twenty (20) days of this Order a statement of whether it intends to contest that the child in this case lacked the capacity to authorize OLRS to have access to her records.

### 2.  The Child's Legal Guardian

It is uncontested that the child's legal guardian was Franklin County Children Services ("FCCS").  See Stratman Decl., ¶6; Washburn Decl., ¶19.  The parties disagree about whether FCCS is the "State" for purposes of 42 U.S.C. §10805(a)(4)(B)(ii), which requires that the individual either not have a legal guardian or have the State as her guardian.  OLRS cites the federal regulation interpreting this statutory section in arguing that FCCS fits within the meaning of the "State" because the regulation says that the individual's guardian can be "the State or one of its political subdivisions." 42 C.F.R. §51.41(b)(2)(ii).  OLRS alleges that FCCS is a political subdivision of the State of Ohio.  The Buckeye Ranch contends that PAMII defines "State" in a way that excludes FCCS. Under §10802(7), the "term 'State' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands.'" 42 U.S.C.A. §10802(7).  According to the Buckeye Ranch, this means that a political subdivision of the State is not included in the definition.

The parties' briefing on this issue is insufficient to enable the Court to reach a decision.  OLRS cites 42 C.F.R. §51.41(b)(2)(ii) in passing, without addressing whether the regulation conflicts with the plain language of the statute or whether FCCS is indeed a political subdivision of the State of

Ohio. Similarly, the Buckeye Ranch's argument--that the statutory definition of "State" should prevail over the regulatory interpretation--is raised in passing in a footnote. The Buckeye Ranch does not address whether the regulation is a reasonable interpretation of the statute or whether the FCCS can be considered an arm of the State, as opposed to a political subdivision.

Accordingly, both motions must be denied as to the issue of whether the child's guardian was the State. See Regents of the Univ. of Calif. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 904 (1997) (requiring a close examination of "the nature of the entity" in deciding if an agency is an arm of the State). The Court will grant the parties leave of forty-five (45) days from the date of this Order to file supplemental briefs on this issue, with responses due twenty-one (21) days thereafter.

### 3. Probable Cause

The final prerequisite of subsection (B) is that the protection and advocacy system have probable cause to believe that an individual has been abused or neglected. The Buckeye Ranch does not dispute that OLRS had probable cause to believe that the 13-year-old child was abused or neglected while she resided at the Buckeye Ranch. Investigator Washburn states that he received an incident report regarding a wrist injury to the child. Mr. Washburn investigated the incident by interviewing Buckeye Ranch staff. Mr. Washburn concluded that, based on the incident report and his staff interviews, there was probable cause to believe that the child had been abused or neglected and might again be in the future.

It is well-settled that a protection and advocacy system is

16

the "final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that may have been subject to abuse or neglect." Arizona Center for Disability Law v. Allen, 197 F.R.D. 689, 693 (D. Ariz. 2000); see also Armstrong, 266 F.Supp.2d at 321; Center For Legal Advocacy v. Earnest, 188 F.Supp.2d 1251, 1257 (D. Colo. 2002); Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C., 152 F.Supp.2d 1150, 1157 (N.D. Iowa 2001).

Thus, OLRS has satisfied the third prerequisite of subsection (B). The Court will defer a decision on whether OLRS is entitled to the wrist records under PAMII until the issues surrounding the first two prerequisites are resolved.

### C. OLRS's Right to the Seclusion and Restraint Logs under PAMII

OLRS sent several requests to the Buckeye Ranch for copies of the Buckeye Ranch's seclusion and restraint logs. The Buckeye Ranch denied the requests, stating that OLRS should obtain the logs through the Department of Mental Health, to whom the Buckeye Ranch had obligation to send them. OLRS strenuously argues that it is entitled to the logs because it has probable cause to believe that one or more children at the Buckeye Ranch were abused or neglected during incidents of seclusion and restraint.[4]

The Buckeye Ranch responds that OLRS never made an attempt to match its requests to the prerequisites of subsection (B) of §10805(a)(4). OLRS presented its requests for access to the logs

---

[4] The complaint requests a permanent injunction requiring the Buckeye Ranch to give OLRS access to seclusion and restraint logs on a monthly basis in the future. In its motion for summary judgment, OLRS clarifies that it seeks that injunction under Ohio law, not under PAMII. The relief OLRS seeks under PAMII is a one-time production of the logs it requested in early 2004.

as part of an attempt to collect data for a statewide database on the use of seclusion and restraint techniques.

The Court agrees with the Buckeye Ranch. Upon reviewing the letters sent by OLRS to the Buckeye Ranch, the Court finds that OLRS based its requests on a need to "develop a statewide seclusion and restraint baseline." Defs.' Mot. to Dismiss, Ex. A. There is no evidence that, at the time it made its requests, OLRS had determined there was probable cause to believe that abuse or neglect had occurred at the Buckeye Ranch. Ms. Knight's finding of probable cause was based in part on the Cincinnati Enquirer articles, which were published after OLRS had already made several requests for the logs. Even once the articles were published, OLRS never conveyed to the Buckeye Ranch its determination that probable cause existed to believe one or more children had been abused or neglected during incidents of seclusion and restraint.

The Court is certainly aware of OLRS's important mission of defending mentally-ill individuals from abuse and neglect. Nonetheless, OLRS's requests for the seclusion and restraint logs were not based on a finding of probable cause. It is unclear exactly when OLRS did find probable cause, but the Buckeye Ranch was not informed of it. The Buckeye Ranch cannot be faulted for refusing to produce the logs when it did not know OLRS had probable cause to believe that incidents of abuse or neglect had occurred. Therefore, OLRS's request for a declaratory judgment that the Buckeye Ranch violated PAMII in denying OLRS access to the seclusion and restraint logs is denied.

18

**D.  OLRS's Right of Access under Ohio Law**

**1.  O.R.C. §5123.60(E)(1)**

The complaint alleges that OLRS has a right to the wrist records and the seclusion and restraint logs under Ohio law.  OLRS has the right of "ready access" to "all records" relating to:

> the commitment, care, treatment, and habilitation of all persons represented by the legal rights service, including those who may be represented pursuant to division (L) of this section, or persons detained, hospitalized, institutionalized, or receiving services under this chapter or Chapter 340., 5119., 5122., or 5126. of the Revised Code that are records maintained by the following entities providing services for those persons: departments; institutions; hospitals; community residential facilities; boards of alcohol, drug addiction, and mental health services; county boards of mental retardation and developmental disabilities; contract agencies of those boards; and any other entity providing services to persons who may be represented by the service pursuant to division (L) of this section.

O.R.C. §5123.60(E)(1).

The Buckeye Ranch argues that access is restricted to only the records of persons represented by OLRS.  According to the Buckeye Ranch, because the "persons detained" clause comes after the word "including," it is a subset of "persons represented"--in other words, OLRS can get records for a person detained, hospitalized, or institutionalized only if OLRS also represents that person.

The Court disagrees with the Buckeye Ranch's statutory interpretation.  The statute uses parallel grammatical construction in setting forth two categories of persons for whom OLRS may obtain records.  The plain language of the statute gives OLRS access to the records of "persons represented" by OLRS and to the records of "persons detained, hospitalized, institutionalized, or receiving services."  The word "including" clarifies that individuals

19

represented by OLRS under O.R.C. §5123.60(L) (concerning individuals who do not have a mental disability) count as "persons represented." The "including" clause is offset by commas on both ends, thus modifying the "persons represented" language preceding that clause, not the "persons detained" language following it.

The Buckeye Ranch argues that this interpretation makes other provisions of O.R.C. §5123.60 surplusage. The Buckeye Ranch contends that O.R.C. §§5123.60(E)(2) and (H) would have no purpose if OLRS can obtain under O.R.C. §§5123.60(E)(1) the records of persons detained, hospitalized, and institutionalized. The Court disagrees because subsections (E)(2) and (H) deal with more than just the records of persons detained, hospitalized, and institutionalized. Subsection (E)(2) gives OLRS access to "computerized data banks" of departments and boards. Subsection (H) authorizes OLRS to issue subpoenas to compel "the appearance and sworn testimony of any person the administrator reasonably believes may be able to provide information or to produce any documents, books, records, papers, or other information necessary to carry out its duties."

The Court finds that OLRS has a right under Ohio law to obtain access to the wrist records and the seclusion and restraint logs. Under §5123.60(E)(1), OLRS's right of access includes access to all records maintained by a community residential facility relating to the care and treatment of persons receiving services under Chapter 5119 of the Ohio Revised Code. It is uncontested that the Buckeye Ranch is a community residential facility and that the wrist records and the seclusion and restraint logs relate to the care and treatment of children residing at the Buckeye Ranch. Further, the

20

children are receiving services under O.R.C. §5119, by which the Ohio Department of Mental Health licenses agencies like the Buckeye Ranch to operate community residential facilities for persons with mental illness.  See O.R.C. §5119.22.

### 2.  Interplay with HIPAA

The Buckeye Ranch, however, argues that the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") prohibits the Buckeye Ranch from disclosing the records.  HIPAA and the regulations promulgated thereunder supersede any contrary state law.  42 U.S.C. §1320d-7(a)(1).  The Buckeye Ranch contends that it will face civil and criminal penalties if it releases "individually identifiable health information," such as the records OLRS wants. See 42 U.S.C. §1320d-6.

### a.  "Required by Law" Exception

OLRS responds that disclosure of the records fits within two exceptions to HIPAA's prohibition against disclosure: the "required by law" exception and the "health oversight activities" exception. The first exception is found in 45 C.F.R. §164.512(a), which provides:

(a) Standard: Uses and disclosures required by law.

(1) A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.

(2) A covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law.

45 C.F.R. §164.512(a).[5]  OLRS argues that disclosure of the records is permitted under HIPAA because state law requires the Buckeye Ranch to provide them to OLRS.

The Buckeye Ranch argues that the "required by law" exception involves more than just the existence of a law requiring disclosure.  The Buckeye Ranch relies on subparagraph (2) of §164.512(a) in arguing that the requirements of paragraphs (c), (e), or (f) must also be satisfied before a disclosure fits within the "required by law" exception.  The Buckeye Ranch contends that none of those paragraphs apply here: paragraph (c) deals with voluntary reporting of abuse, neglect or domestic violence; paragraph (e) deals with disclosures for judicial and administrative proceedings; and paragraph (f) deals with disclosures for law enforcement purposes.

The Court finds the Buckeye Ranch's interpretation of paragraph (a) to be unpersuasive. Subparagraph (1) is an exception that stands on its own, allowing a covered entity to make a disclosure otherwise prohibited by HIPAA if that disclosure is required by another law.  In disclosing the information, the covered entity must simply comply with the requirements of the other law--HIPAA imposes no further conditions.  Only when the disclosure involves the particular topics covered by paragraphs (c), (e), or (f) must the covered entity also comply with the

_____

[5]  HIPAA delegates broad authority to the Secretary of Health and Human Services to promulgate standards for protecting the privacy of individually identifiable health information. 42 U.S.C. §§1320d-1(d), 1320d-3(a),(b). HIPAA and the regulatory standards promulgated by the Secretary expressly "supersede any contrary provision of State law."  42 U.S.C. §1320d-7(a)(1). Both parties rely heavily on these regulatory standards, and neither party argues that a conflict exists between one of the standards and the statutory language of HIPAA.

additional requirements set forth in those paragraphs.  Because the
topics covered by paragraphs (c), (e), or (f) are narrow, the
"required by law" exception would lose its force if all required
disclosures had to fit within those topics in order for HIPAA to
permit them.

A reading of the final commentary accompanying the HIPAA
regulations confirms that the Court's interpretation is correct.
The commentary notes that the phrase "required by law" "is intended
to be read broadly to include the full array of binding legal
authority, such as constitutions, statutes, rules, regulations . .
. . [I]t encompasses federal, state or local actions with legally
binding effect . . . ."  65 Fed. Reg. 82462, 82668.  The commentary
states that §164.512(a) was generally meant not to interfere with,
or add onto, the requirements of those other laws:

> [W]e intend this provision to preserve access to
> information considered important enough by state or
> federal authorities to require its disclosure by law. .
> . . [S]uch required uses and disclosures arise in a
> myriad of other areas of law, ranging from topics
> addressing national security (uses and disclosures to
> obtain security clearances), to public health (reporting
> of communicable diseases), to law enforcement
> (disclosures of gun shot wounds).  Required uses and
> disclosures also may address broad national concerns or
> particular regional or state concerns.  It is not
> possible, or appropriate, for [Health and Human Services]
> to reassess the legitimacy of or the need for each of
> these mandates in each of their specialized contexts.

65 Fed. Reg. 82462, 82667.  Paragraphs (c), (e), and (f) represent
"cases where particular concerns have been raised by legal mandates
in other laws."  Id.  Where one of those particular concerns is
present, "we allow disclosure as required by law, and we establish
additional requirements to protect privacy (for example, informing
the individual as required in §164.512(c)) when covered entities

23

make a legally mandated disclosure." Id.

Albeit in the context of the Developmental Disabilities Bill of Rights Act, the commentary specifically states that HIPAA does not hinder the ability of protection and advocacy systems to investigate abuse and neglect. "[C]overed entities may make these disclosures under §164.512(a) without first obtaining an individual's authorization, except in those circumstances in which the [Developmental Disabilities] Act requires the individual's authorization. Therefore, the rules below will not impede the functioning of the existing Protection and Advocacy System." 65 Fed. Reg. 82462, 82594.

Here, Ohio law requires the Buckeye Ranch to provide OLRS with access to the wrist records and the seclusion and restraint logs. See O.R.C. §5123.60(E)(1). The Buckeye Ranch itself admits that these disclosures do not involve the topics covered in paragraphs (c), (e), or (f) of 45 C.F.R. §164.512. Paragraph (c), involving victims of abuse, neglect, and domestic violence, is the only paragraph that might apply at first glance; however, in the final analysis, it does not apply because it pertains to situations in which the covered entity suspects abuse or neglect and wishes to voluntarily disclose it to authorities. The situation in the case at hand is different because it is OLRS, not the covered entity the Buckeye Ranch, who suspects abuse or neglect and because the Buckeye Ranch is not volunteering to make the disclosure.

Accordingly, the Court finds that HIPAA does not prohibit the Buckeye Ranch from making the disclosures that Ohio law requires it to make.

24

### b. "Health Oversight Activities" Exception

OLRS argues in the alternative that the "health oversight activities" exception to HIPAA applies.  Under this exception, a covered entity may disclose protected health information to:

> a health oversight agency for oversight activities authorized by law, including audits; civil, administrative, or criminal investigations; inspections; licensure or disciplinary actions; civil, administrative, or criminal proceedings or actions; or other activities necessary for appropriate oversight of:
> (i) The health care system;
> (ii) Government benefit programs for which health information is relevant to beneficiary eligibility;
> (iii) Entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards; or
> (iv) Entities subject to civil rights laws for which health information is necessary for determining compliance.

45 C.F.R. §164.512(d)(1).  HIPPA defines a "health oversight agency" as:

> an agency or authority of the United States, a State, a territory, a political subdivision of a State or territory, or an Indian tribe, or a person or entity acting under a grant of authority from or contract with such public agency, including the employees or agents of such public agency or its contractors or persons or entities to whom it has granted authority, that is authorized by law to oversee the health care system (whether public or private) or government programs in which health information is necessary to determine eligibility or compliance, or to enforce civil rights laws for which health information is relevant.

45 C.F.R. §164.501.  OLRS argues that it is a health oversight agency because it has been given authority under federal and state law to protect the civil rights of persons with mental illness.

The Buckeye Ranch argues that the "health oversight activities" exception does not apply because other state agencies have been entrusted with oversight of the matters OLRS wants to

25

investigate. According to the Buckeye Ranch, public children services agencies have the authority to investigate reports of child abuse and neglect, see Ohio Rev. Code §5153.16, and the Ohio Department of Mental Health has oversight of the use of restraint and seclusion techniques in mental health facilities, see Ohio Admin. Code §5122-30-17. The Buckeye Ranch also points out that protection and advocacy systems are not among the entities listed in the commentary to the regulations as examples of health oversight agencies. See 65 Fed. Reg. 82491.

The Court finds that OLRS meets the definition of a health oversight agency. The first requirement is that the entity seeking access be an agency of the United States, a State, or a political subdivision of a State. Here, there is no dispute that OLRS, as a state agency created by O.R.C. §5123.60, is either an arm of the State of Ohio or is a political subdivision of Ohio--under HIPAA, it does not matter which OLRS is. Further, OLRS is authorized by federal and state law to enforce civil rights laws for which health information is relevant. OLRS is charged with protecting and advocating the rights of mentally ill persons. See 42 U.S.C. §10801(b)(2)(B); Ohio Rev. Code 5123.60(A). OLRS has the authority to investigate incidents of abuse and neglect of individuals with mental illness and to pursue legal and administrative remedies to ensure the protection of persons with mental illness who are receiving care or treatment in Ohio. See 42 U.S.C. §10805(a)(1)(A)-(B); Ohio Rev. Code 5123.60(A). Federal and state law both equip OLRS with the ability to gather health information relevant in determining if the civil rights of a mentally ill person has been violated. See 42 U.S.C. §10806(b)(3)(A); Ohio Rev.

26

Code 5123.60(E).  In essence, OLRS performs the oversight function of protecting mentally-ill individuals in Ohio.

The Buckeye Ranch argues that OLRS cannot be a health oversight agency because other state agencies already oversee the matters OLRS wants to investigate.  There is no support for this argument in HIPAA or the regulations.  The regulatory definition of "health oversight agency" contains no exclusion of agencies whose oversight authority may overlap with that of another agency.  The Buckeye Ranch's argument is also contrary to public policy.  OLRS serves to protect and advocate the rights of mentally-ill individuals.  Under the Buckeye Ranch's argument, OLRS cannot carry out that duty because the individuals in question are children, who are all the more vulnerable to abuse and neglect.  It is not unacceptable to have more than one agency overseeing the care and treatment of these vulnerable members of society.

The Buckeye Ranch also points out the omission of protection and advocacy systems from the list of entities named in the regulatory commentary as examples of health oversight agencies.  However, it is clear that the list is non-exclusive.  The commentary notes that the list merely represents "examples" of such agencies.  See 65 Fed. Reg. 82462, 82492.  The Court finds that OLRS satisfies the plain language definition of a "health oversight agency" in 45 C.F.R. §164.501.

The Court further finds that OLRS was engaged in a health oversight activity when it attempted to investigate whether the 13-year-old child who suffered the wrist injury at the Buckeye Ranch had been abused or neglected.  Included among "health oversight activities" are civil and administrative investigations necessary

27

for oversight of entities subject to civil rights laws for which health information is necessary for determining compliance. OLRS made its request for the wrist records in an effort to determine whether the child's civil rights had been violated while she resided at the Buckeye Ranch.

With respect to the seclusion and restraint logs, OLRS states that it seeks ongoing and prospective production of the logs.[6] The Court finds that this too qualifies as a health oversight activity. "Inspections" are among the health oversight activities enumerated in the regulation. Thus, OLRS may inspect those logs.

## IV. Conclusion

For the reasons stated above, the Buckeye Ranch's June 8, 2004 motion to dismiss (doc. 4) is GRANTED IN PART and DENIED IN PART, and Ohio Legal Rights Service's June 28, 2004 motion for summary judgment (doc. 5) is GRANTED IN PART and DENIED IN PART.

The Court's rulings with respect to OLRS's request for disclosure of the records under federal law, 42 U.S.C. §10805(a)(4)(B), are as follows: consideration of OLRS's request under PAMII for the wrist records of the 13-year-old child is deferred until the parties submit supplemental briefing; and OLRS's request under PAMII for one-time production of the Buckeye Ranch's seclusion and restraint logs from early 2004 is denied.

The Court's rulings with respect to OLRS's request for disclosure of the records under Ohio law, O.R.C. §5123.60(E)(1), are as follows: OLRS's request for declaratory relief that it is entitled under O.R.C. §5123.60(E)(1) to the wrist records and to

---

[6] By contrast, OLRS's request of the logs under PAMII was for a one-time production of the early 2004 logs.

ongoing and prospective access to seclusion and restraint logs is granted; and disclosure of the records and logs is permitted under the "required by law" and "health oversight activities" exceptions to HIPAA, 45 C.F.R. §§164.512(a)(1) and (d)(1).  The Court notes that the above rulings on the state law issues may render moot OLRS's request for disclosure of the wrist records under federal law.

The Buckeye Ranch is PERMANENTLY ENJOINED from denying OLRS's requests for the wrist records and the seclusion and restraint logs.  The Buckeye Ranch is ordered to provide OLRS with access to the wrist records and to all seclusion and restraint logs produced since the filing of this lawsuit.

It is so ordered.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: April 12, 2005

29